UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

FILED

02 APR 11 PM 2: 35

U.S. ~~DISTRICT COURT~~
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| JERRY JAMES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-01-S-2648-NW |
| | ) | |
| CITY OF RUSSELLVILLE, | ) | |
| ALABAMA; *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

ENTERED

APR 11 2002

## MEMORANDUM OPINION

Plaintiff, Jerry James, alleges that various boards, officials, and employees of the City of

Russellville, Alabama, denied him rights secured by the Due Process and Equal Protection Clauses

of the Fourteenth Amendment, and the National Manufactured Housing and Safety Standards Act

of 1974, as amended, 42 U.S.C. § 5401 *et seq.* He also asserts that defendants conspired to violate

his constitutional and statutory rights by denying him a certificate of occupancy for a manufactured

home situated on a residential lot in the City of Russellville, Alabama. All of plaintiff's claims, with

the possible exception of his civil conspiracy claim, are based upon 42 U.S.C. § 1983. The action

now is before the court on a motion to dismiss which, following consideration of the pleadings,

briefs, and oral arguments of counsel, the court concludes is due to be granted.

## I. PROCEDURAL HISTORY

Plaintiff filed his original complaint on October 17, 2001. The caption of that pleading

named as defendants four public entities and twenty-five individual officials or employees of the

City of Russellville.[1] Six of those defendants filed an answer to the complaint on November 19,

---

[1] *See* the original Complaint (doc. no. 1) and First Amended Complaint (doc. no. 35) at 1, both identifying the following entities and individuals in the caption: (1) the City of Russellville, Alabama; (2) the Russellville Electrical Board; (3) the Russellville Zoning Board of Adjustment; (4) the Russellville Planning and Zoning Board; (5) Bois Porter,

2001, asserting, in part, the defense of qualified immunity.[2]  Two additional defendants answered the complaint on November 30, 2001, again asserting, in part, qualified immunity.[3]  Nineteen of the remaining twenty-one defendants[4] filed a motion to dismiss the complaint,[5] asserting that plaintiff failed to state claims upon which relief could be granted, and that the individual defendants were protected by the doctrine of qualified immunity.

In response to the motion to dismiss, plaintiff moved to amend his complaint.[6]  A copy of the proposed amended complaint was attached to the motion.[7]  That proposed pleading was not signed by counsel and, thus, did not comply with Federal Rule of Civil Procedure 11(a),[8] but its caption identified the same twenty-nine entities and individuals as defendants.[9]

The two motions were orally argued on March 18, 2002.  Counsel for the nineteen moving defendants stated that he had no opposition to this court allowing plaintiff to amend his complaint,

---

in his official capacity as Building Inspector for the City of Russellville, Alabama; (6) Johnny Brown, Mayor of the City of Russellville; (7) Jerry Groce; (8) Sheila Ward; (9) John Pilati; (10) Ed Green; (11) Evelyn Groce; (12) Pam Taylor; (13) Joe Hamilton; (14) Howard Hillman; (15) Jimmy Cross; (16) Brenda Jackson; (17) James T. Hellums; (18) Charles Holcomb; (19) Gordon Aycock; (20) Robert Hillman; (21) Billy Witt; (22) Bill Jackson; (23) Bobby Taylor; (24) Craig Grissom; (25) Buckshot Saint; (26) Tinker Malone; (27) Robbie Richardson; (28) Steve DeFoor; and (29) William Stone, "in their official and individual capacities."  *See also* First Amended Complaint (doc. no. 35) ¶ 2 ("[T]he individual Defendants are all officials of the City of Russellville, and Russellville Electrical Board.").

    [2] *See* Answer of defendants Russellville Electric Board, Gordon Aycock, Robert Hillman, Billy Witt, Bill Jackson, and Bobby Taylor (doc. no. 22), ¶ 11.

    [3] *See* Answer of defendants William Stone and Steve DeFoor (doc. no. 26), ¶ 11.

    [4] Two entities named as defendants in the captions of plaintiff's original and amended complaints — *i.e.*, the "City of Russellville Zoning Board of Adjustment" and the "Russellville Planning and Zoning Board" — if served, have not yet filed any responsive pleading.

    [5] *See* Motion to Dismiss of defendants City of Russellville, Alabama, Russellville Building Inspector Bois Porter, Russellville Mayor Johnny Brown, Jerry Groce, Sheila Ward, John Pilati, Ed Green, Evelyn Groce, Pam Taylor, Joe Hamilton, Howard Hillman, Jimmy Cross, Brenda Jackson, James T. Hellums, Charles Holcomb, Burns "Buckshot" Saint, Thomas "Tinker" Malone, Craig Grissom, and Robbie Richardson (doc. no. 23).

    [6] Plaintiff's Motion for Leave to Amend (doc. no. 27).

    [7] *Id.*, Ex. "A."

    [8] Federal Rule of Civil Procedure 11(a) requires, in pertinent part, that "[e]very pleading, written motion and other paper shall be signed by at least one attorney of record in the attorney's individual name...."

    [9] *Compare* doc. no. 1 *with* doc. no. 27, Ex. "A."

2

provided the motion to dismiss was construed as being reasserted, on the same grounds, against all claims contained in the amended complaint. Plaintiff's attorney consented, and argument proceeded on that basis.[10] A signed, "First Amended Complaint" was filed on April 4, 2002 (doc. no. 35). The following discussion therefore addresses the claims asserted in plaintiff's amended complaint.

## II. STANDARDS FOR EVALUATING DEFENDANTS' MOTION TO DISMISS

As a preliminary matter, although ten of the twenty-nine defendants identified in the caption of plaintiff's amended complaint have not joined in the subject motion to dismiss, a complaint still will be vulnerable to dismissal under Rule 12(b)(6) when its allegations, on their face, show either that plaintiff has failed to state any claim upon which relief can be granted, or that "an affirmative defense bars recovery on the claim." *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir. 2001) (en banc) (citations omitted).

The Federal Rules of Civil Procedure require only that a complaint contain a "'short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is

---

[10] Federal Rule of Civil Procedure 15 addresses amended and supplemental pleadings, and provides in pertinent part that:

> A party may amend the party's pleading once as a matter of course at any time *before a responsive pleading is served* or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. *Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party*; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Fed. R. Civ. P. 15(a) (emphasis supplied).
    In line with Rule 15(a)'s admonition that "leave [to amend] shall be freely given when justice so requires," the Eleventh Circuit requires that a plaintiff be afforded an opportunity to amend when it appears that a more adequately pled complaint might state a claim that would survive a motion to dismiss. *See, e.g., Welch v. Laney*, 57 F.3d 1004, 1009 (11th Cir. 1995) ("Where a more carefully drafted complaint might state a claim upon which relief could be granted, the district court should allow the plaintiff [an opportunity] to amend the complaint rather than dismiss it.") (citing *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991) ("Where a more carefully drafted complaint might state a claim, a plaintiff *must be given at least one chance to amend* the complaint before the district court dismisses the action with prejudice.") (emphasis supplied)).

and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (quoting Fed. R. Civ. P. 8(a)(2)[11]). Consequently, a complaint should not be dismissed for failing to state a claim upon which relief can be granted, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46, 78 S.Ct. at 102.[12] When ruling upon a Rule 12(b)(6) motion, the court must accept all well-pleaded facts as true, and construe them in the light most favorable to the non-moving party. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *see also, e.g., Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364, 1369 (11th Cir. 1997); *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983). Further, "[a] complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must

---

[11] Federal Rule of Civil Procedure 8(a)(2) provides: "A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief...." *See also Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364 (11th Cir. 1997), stating:

> The purpose of a Rule 12(b)(6) motion is to test the facial sufficiency of the statement of [a plaintiff's] claim for relief. It is read alongside Fed.R.Civ.P. 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity, and the analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto. ...

*Id.* at 1368-69 (citation omitted); *see also Conley v. Gibson*, 355 U.S. 41, 47-48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").

[12] *See also, e.g., Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (holding that a complaint should be dismissed for failure to state a claim "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations" of the plaintiff's complaint); *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir. 2001) (en banc) (quoting *Conley*, 355 U.S. at 45-46, 78 S.Ct. at 102); *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992) ("A complaint may not be dismissed unless the plaintiff can prove no set of facts which would entitle him to relief."); *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.) ("[T]he 'accepted rule' for appraising the sufficiency of a complaint is 'that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.'") (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)), *reh'g denied*, 840 F.2d 25, *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988); *Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986) (same).

determine if the allegations provide for relief on *any* possible theory." *Brooks*, 116 F.3d at 1369 (emphasis in original) (citation omitted).

Thus, the threshold requirements for a complaint to survive a Rule 12(b)(6) motion to dismiss are "exceedingly low." *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 703 (11th Cir. 1985). Such motions accordingly are "viewed with disfavor and rarely granted." *Brooks*, 116 F.3d at 1369 (citing *Madison v. Purdy*, 410 F.2d 99, 100 (5th Cir. 1969)), and *International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service*, 400 F.2d 465, 471 (5th Cir. 1968)).

This low bar has been raised, however, with respect to some claims based upon 42 U.S.C. § 1983. Initially, a distinction must be drawn between the pleading requirements for § 1983 claims asserted against municipal governmental entities, on the one hand, and municipal officials sued personally, "in their individual capacities," on the other. With regard to the former category of claims, the Supreme Court has held that a court may not impose a heightened pleading requirement, "more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure," to § 1983 claims against municipalities. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993). The *Leatherman* Court instructed federal courts to use the mechanisms of summary judgment and discovery to "weed out unmeritorious claims" against municipal governmental entities, *id.* at 168, 113 S.Ct. at 1163, and affirmed that notice pleading is all that is required for claims of municipal liability under § 1983. Even so, a plaintiff must at least put the municipality *on notice* of the particular custom or policy that is alleged to have caused the plaintiff's injury. *See Leatherman*, 507 U.S. at 168, 113 S.Ct. at 1163.

The *Leatherman* Court specifically declined to extend its holding to claims against individual

government officials, *see id.* at 167, 113 S.Ct. at 1162, and the Eleventh Circuit has followed suit.

*See GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1368 (11th Cir. 1998).  Thus, "the

heightened pleading requirement is the law of this circuit" with regard to a plaintiff's § 1983 claims

against individual governmental actors.  *Id.*

> [W]hile Fed. R. Civ. P. 8 allows a plaintiff considerable leeway in framing [his] complaint, this circuit, along with others, has tightened the application of Rule 8 with respect to § 1983 cases in an effort to weed out nonmeritorious claims, requiring that a § 1983 plaintiff allege with some specificity the facts which make out [his] claim. Some factual detail in the pleadings is necessary to the adjudication of § 1983 claims. This is particularly true in cases involving qualified immunity, where we must determine whether a defendant's actions violated a clearly established right.

*Id.* at 1367 (citations omitted).[13]

Finally, a district court may dismiss a complaint when, after determining the plaintiff's

original pleading did not state a claim upon which relief could be granted, and, after allowing the

plaintiff an opportunity to amend, the plaintiff still failed to properly amend his or her complaint in

a manner that cured the deficiency.  *See Welch v. Laney*, 57 F.3d 1004, 1009 (11th Cir. 1995);

*Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir. 1985).

### III. STATEMENT OF FACTS

Plaintiff acquired a number of residential lots within the city limits of Russellville, Alabama

"from a local developer,"[14] and was "told *by the developer* from whom he purchased the lots" that

the property had been approved by "the Russellville Zoning Board ... and the City Building

---

[13] *See also, e.g., Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992) ("[W]e want to use this opportunity to repeat that, 'in an effort to eliminate nonmeritorious claims on the pleadings and to protect public officials from protracted litigation involving specious claims, we, and other courts, have tightened the application of Rule 8 to § 1983 cases.'") (quoting *Arnold v. Board of Education of Escambia County*, 880 F.2d 305, 309 (11th Cir. 1989)). In such circumstances, a plaintiff's complaint must "state a violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Oladeinde*, 963 F.2d at 1485 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

[14] First Amended Complaint (doc. no. 35), ¶ 7. Plaintiff does not state when the transaction occurred, how many lots he purchased, or identify the seller.

Inspector ... for siting manufactured housing."[15]  That representation was important to plaintiff, because he "purchased the property with the intention of developing the property into a subdivision consisting of manufactured housing."[16]  In fact, plaintiff says, on the date of his purchase the lots already had been

> unanimously approved by the Russellville Planning Commission for a community of manufactured housing as reflected in the minutes from the August 24, 2000 meeting.  The minutes of the August 24th meeting reflect that defendant [Bois] Porter, [the City's Building Inspector,] among others, was present at that meeting. The previous owner also filed the requisite restrictions regarding the subdivision known as "Deer Run Subdivision" with the Probate Judge of Franklin County, Alabama.[17]

"Plaintiff intended to place all of the [manufactured] homes on spacious, appropriately sized lots with the requisite set-back from the street and in compliance with all residential zoning regulations and restrictions governing homes erected within the Russellville city limits."[18]  He also intended to connect water, sewer, and electrical lines to the housing units in a manner consistent with homes constructed on-site, rather than "the manner traditionally associated with the set-up of manufactured housing."[19]

Plaintiff began the development by placing one manufactured home on a lot located at 233 Doris Street, within the intended subdivision.[20]

The initial home located at 233 Doris Street was permanently affixed to a

---

[15] *Id.* (emphasis supplied).  Comprehension of plaintiff's claims is hindered by his inconsistent use of terms. The caption of his amended complaint names the "Russellville *Zoning Board of Adjustment*" and "Russellville *Planning and Zoning Board*" as defendants.  The text of his complaint, however, variously refers to: the "Russellville *Zoning Board*" (¶ 7); the "Russellville *Planning Commission*" (¶ 8); the "*Zoning Board of Adjustment*" (¶ 20); and the "*Russellville Planning Commission and Zoning Board of Adjustment*" (¶ 21).  (Emphasis supplied to all quotations.)

[16] First Amended Complaint (doc. no. 35) ¶ 9.

[17] *Id.* ¶ 8 (footnote omitted).

[18] *Id.* ¶ 12.

[19] *Id.* ¶ 14.

[20] *Id.* ¶ 10.

7

concrete foundation absent wheels, axles, hitches or any other temporary accessory necessary for transport. Plaintiff intended to site all of the homes in the subdivision in the same manner. Once Plaintiff permanently affixed the house at 233 Doris Street to a permanent foundation, it achieved the same permanence, aesthetics and compatibility of a typical permanent single family detached dwelling located in any R-1 or R-2 residential district.[21]

Plaintiff secured water and sewage connections without difficulty,[22] but "met with considerable resistence"[23] when he "attempted to have the electrical meter boxes located at the side of the home, in the same manner as that of a site-built residence."[24]  Plaintiff was told by an unidentified employee of the Russellville Electrical Board that

> he would have to place the meter boxes on a pole in the backyard — approximately ten (10) to fifteen (15) feet from the home. Upon inquiry as to why the meter boxes could not be placed at the side of the home, Plaintiff was informed "that's just the way it is." Despite repeated inquiries regarding why manufactured housing meter boxes had to be located on a pole a considerable distance from the home, Plaintiff was never informed as to why that was a necessity. Rather, Plaintiff was simply told again, "that's just the way it is." Plaintiff was never informed by any state or local official that such a restriction was necessary because it was rationally related to a public health, safety and/or welfare goal or, because of some other legitimate public purpose.[25]

The present dispute appears to have arisen after plaintiff was told that "he had to obtain a certificate of occupancy from the Building Inspector," before electrical connections would be authorized.[26] Plaintiff accordingly applied for a certificate of occupancy, but was told by defendant Bois Porter, the City's Building Inspector, that a manufactured home could not be placed on the lot at 233 Doris Street.  Porter stated that this was because the property was in an "R-1" zone, and manufactured homes were not permitted in such zones.  Consequently, Porter said, he could not

---

[21] *Id.* ¶ 13.

[22] First Amended Complaint (doc. no. 35) ¶¶ 14-16.

[23] *Id.* ¶ 17.

[24] *Id.* ¶ 18.

[25] *Id.*

[26] *Id.* ¶ 19.

8

"connect or inspect and approve utility connection until there [was] a favorable ruling from the Zoning Board of Adjustment."[27]

> The Building Inspector purported to base his denial [of a certificate of occupancy] on Russellville City Ordinances §§ 40.0-43.0 which purport to restrict the siting of manufactured homes on lots in areas designated as "residential." That is, the city ordinances purport to prohibit anyone from siting a manufactured home in areas designated as R-1, R-2, or R-3. However, the City has repeatedly allowed other manufactured homes within its city limits, including modular homes. Indeed, the Mayor of Russellville [defendant Johnny Brown] has a manufactured home located on his property. Bois Porter [another defendant, and the City's] building inspector, admits to having a manufactured home on his property in the City of Russellville until 1988, and upon information and belief, he still owns it. In fact, minutes from meeting of the Russellville Planning Commission and Zoning Board of Adjustment are replete with decisions to allow individuals to site manufactured homes on property inside the city limits and in areas designated as "R-1," "R-2," and "R-3."[28]

Plaintiff further asserts that Russellville's zoning ordinances are "antiquated," because they have not been amended "in over twenty years," and employ "the out-of-date phrase 'mobile home,' which was replaced and universally recognized in 1980 with the term 'manufactured home' by HUD guidelines and regulations."[29]

Plaintiff seeks money damages for alleged deprivations of his "due process rights" and "rights to equal protection pursuant to 42 U.S.C. § 1983" in Counts "One" and "Two," respectively, and for an alleged "conspiracy to violate Plaintiffs [sic] statutory and constitutional rights" in Count "III" [sic].[30]

## IV. DISCUSSION

42 U.S.C. § 1983 is not jurisdictional, and it is not "itself a source of substantive rights, but

---

[27] *Id.* ¶ 20.

[28] First Amended Complaint (doc. no. 35) ¶ 21.

[29] *Id.* ¶ 23.

[30] *Id.* at 10.

merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citations and internal quotation marks omitted). Thus, "in any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *partially overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). No defendant denies that the acts complained of here were committed under color of state law. Consequently, this court must only determine whether the conduct deprived plaintiff "of rights, privileges, or immunities secured by the Constitution or laws of the United States."

A.    **Statutory Claim and Preemption**

Before the court can reach this inquiry, however, it considers that plaintiff has founded his opposition to dismissal at this juncture on the National Manufactured Housing Construction and Safety Standards Act of 1974, as amended, 42 U.S.C. §§ 5401-5426 ("1974 Act"), which, plaintiff contends, defendants have failed to address.[31] More specifically, plaintiff asserts that defendants cannot ground their motion to dismiss in the provisions of Russellville's local zoning ordinances, because those ordinances are preempted by the 1974 Act.[32] Plaintiff writes that the 1974 Act "preempts all local ordinances and/or state laws regulating compliance and placement of manufactured housing thereby, *giving this Court jurisdiction to hear Plaintiff's claims* — a

---

[31] *See* Plaintiff's Response (doc. no. 28), at 8.
[32] *See id.*

10

contention which is never refuted by Defendants."³³   Although unclear, it appears from this

statement that plaintiff would have the court acknowledge that the 1974 Act *completely* preempts

state and local zoning ordinances concerning manufactured housing. This, the court declines to do.³⁴

Even so, the 1974 Act may yet preempt defendant City of Russellville from legislating

through its zoning ordinances to the manufactured housing industry.  This will be the case if the

City's zoning ordinances conflict with the provisions of the 1974 Act; state law that conflicts with

federal law is preempted by the federal law, and is nullified by the Supremacy Clause of the

Constitution. *See Fidelity Federal Savings and Loan Association v. Cuesta*, 458 U.S. 141, 152-53,

102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *Lewis v. Brunswick Corp.*, 107 F.3d 1494, 1500 (11th

Cir. 1997) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120

---

³³ *Id.* at 9 (emphasis supplied).

³⁴ District courts have original jurisdiction over "federal question" cases; that is, those cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A cause of action will "arise under" federal law "only when the plaintiff's well-pleaded complaint raises issues of federal law." *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). This "well-pleaded complaint rule" has become the "basic principle marking the boundaries of the federal question jurisdiction of the federal district courts." *Id.* (citing *Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 9-12, 103 S.Ct. 2841, 2846-48, 77 L.Ed.2d 420 (1983)).

An exception has developed as a corollary to the well-pleaded complaint rule: "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Insurance Co.* at 63-64, 107 S.Ct. at 1546. This corollary is known as the "complete preemption" doctrine, and will come into play when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc.*, 428 U.S. at 392, 107 S.Ct. at 2430 (quoting *Metropolitan Life Insurance Co.* at 65, 107 S.Ct. at 1547). The complete preemption doctrine has been applied by federal courts primarily in cases implicating claims under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, ("ERISA"), *see Metropolitan Life Insurance Co.*, 481 U.S. at 60, 107 S.Ct. at 1544, and § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), *see Caterpillar Inc.*, 482 U.S. at 393, 107 S.Ct. at 2430. Outside the purview of these two statutes, the Supreme Court "has revisited the complete preemption doctrine only sparingly ...." *BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.*, 182 F.3d 851, 855 (11th Cir. 1999). While the Supreme Court "recognizes the existence of the complete preemption doctrine, the Court does so hesitatingly and displays no enthusiasm to extend the doctrine into areas of law beyond the LMRA and ERISA." *Id.* at 856 (citing Supreme Court cases that acknowledge complete preemption doctrine).

Whether a statute completely preempts the field of state law in an area is a matter of congressional intent; indeed, "the complete preemption analysis ... focuses primarily upon evaluating Congress's intent." *Id.* at 857. Without evidence from plaintiff of congressional intent to completely preempt state law, this court declines to find that Congress intended total occupation of the field of manufactured housing law by its passage of the 1974 Act.

L.Ed.2d 407 (1992)); *see also* U.S. Const. art. IV, § 1.

As the Alabama Supreme Court has correctly observed, however, "[p]reemption is the exception to the general rule that federal law does not displace existing state law. Congress must clearly manifest a purpose to supersede the common law of the states for preemption to apply." *Turner v. PFS Corp.*, 674 So. 2d 60, 62 (Ala. 1995) (citing *Cipollone*, 505 U.S. at 515, 112 S.Ct. at 2617). The court is mindful, then, of the federalism concerns implicated by plaintiff's assertions that local zoning ordinances have been preempted by federal legislation, and relies on the guidance of the United States Supreme Court in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), in which the Court observed that:

> Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Thus, since our decision in *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the *historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.*" *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). *Accordingly, "'[t]he purpose of Congress is the ultimate touchstone'" of pre-emption analysis. Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978) (quoting *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963)).
>
> Congress' intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, *see Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983), or if federal law so thoroughly occupies a legislative field "'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Rice v. Santa Fe Elevator*

*Corp.,* 331 U.S., at 230, 67 S.Ct., at 1152).

*Cipollone,* 505 U.S. at 516, 112 S.Ct. at 2617 (emphasis added).

As the *Cipollone* Court explained, congressional intent to preempt state law may be express or implied: either by Congress's explicit statement in the statutory language, or when it is implicit in the statute's "structure and purpose." *Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). The Eleventh Circuit has described three methods by which congressional intent to preempt state law may be revealed:

> (1) "express preemption," in which Congress defines explicitly the extent to which its enactments preempt state law; (2) "field preemption," in which state law is preempted because Congress has regulated a field so pervasively, or federal law touches on a field implicating such a dominant federal interest, that an intent for federal law to occupy the field exclusively may be inferred; and (3) "conflict preemption," in which state law is preempted by implication because state and federal law actually conflict, so that it is impossible to comply with both, or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Lewis v. Brunswick Corp.*, 107 F.3d 1494, 1500 (11th Cir. 1997) (quoting *Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996) (citations omitted)). By including an express preemption clause in the 1974 Act, *see* 42 U.S.C. § 5403(d) (section entitled "Supremacy of Federal Standards"), "Congress has demonstrated its intent that the Act preempt *at least some* state law." *Lewis,* 107 F.3d at 1500 (emphasis supplied).

Thus, the issue before this court is not *whether* the 1974 Act preempts the City of Russellville's zoning ordinances, but rather it is *the extent to which* the 1974 Act has preemptive effect on those ordinances. *Id.* (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996)).

13

Plaintiff asserts that his claims come within the reach of the 1974 Act's express preemption clause, which states, in its amended form, that

> [w]henever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard. *Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter.* Subject to section 5404 of this title, there is reserved to each State the right to establish standards for the stabilizing and support systems of manufactured homes sited within that State, and for the foundations on which manufactured homes sited within that State are installed, and the right to enforce compliance with such standards, except that such standards shall be consistent with the purposes of this chapter and shall be consistent with the design of the manufacturer.

42 U.S.C. § 5403(d) (1994 & Supp. 2001) (emphasis supplied). Plaintiff contends further that the December 2000 amendments to the 1974 Act have broadened the reach of the preemptive provisions of the original legislation, so as to prevent the City of Russellville from regulating the placement of manufactured housing.[35]

The 1974 Act was "originally designed to transition manufactured housing from the old trailer-model into a more reliable, alternative source of affordable housing, *built at a plant site under a uniform Federal building code.*" H.R. Rep. No. 106-553, at 66 (2000) (emphasis supplied). The purposes of the 1974 Act, as stated by Congress and reiterated by the Eleventh Circuit, were to "reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of

---

[35] Plaintiff's Response (doc. no. 28), at 9.

14

manufactured homes." 42 U.S.C. § 5401 (1983); *see also Florida Manufactured Housing Association, Inc. v. Cisneros*, 53 F.3d 1565, 1569 (11th Cir. 1995).

In December of 2000, Congress amended the 1974 Act in order to "update and restructure the provisions of the [1974 Act] .... to ensure[] that significant improvements will be made to the quality, safety and affordability of these manufactured homes and the Federal management of the program." H.R. Rep. No. 106-553, at 67. The March 29, 2000 House Report advocating the need for such an amendment explained that the "current bipartisan support for the bill reflects the extensive negotiation efforts to address consumer concerns with the installation of manufactured homes, as well as the lack of consumer recourse when repairs are needed on poorly installed homes." *Id.* Section 5401 of the 1974 Act, as amended,[36] currently reads as follows:

**(a) Findings**

Congress finds that —

(1) manufactured housing plays a vital role in meeting the housing needs of the Nation; and

(2) manufactured homes provide a significant resource for affordable home-ownership and rental housing accessible to all Americans.

**(b) Purposes**

The purposes of this subchapter are —

(1) to protect the quality, durability, safety, and affordability of manufactured homes;

(2) to facilitate the availability of affordable manufactured homes and to increase homeownership for all Americans;

(3) to provide for the establishment of practical, uniform, and, to the extent possible, performance-based Federal construction standards for manufactured homes;

---

[36] The term "1974 Act" is used throughout the opinion from this juncture to refer to the 1974 Act as amended.

(4) to encourage innovative and cost-effective construction techniques for manufactured homes;

(5) to protect residents of manufactured homes with respect to personal injuries and the amount of insurance costs and property damages in manufactured housing, consistent with the other purposes of this section;

(6) to establish a balanced consensus process for the development, revision, and interpretation of Federal construction and safety standards for manufactured homes and related regulations for the enforcement of such standards;

(7) to ensure uniform and effective enforcement of Federal construction and safety standards for manufactured homes; and

(8) to ensure that the public interest in, and need for, affordable manufactured housing is duly considered in all determinations relating to the Federal Standards and their enforcement.

42 U.S.C. § 5401 (1994 & Supp. 2001).[37]

In the words of the Eleventh Circuit, the 1974 Act, even after amendment, "undoubtedly represents consumer safety legislation." *See Scurlock v. City of Lynn Haven, Florida*, 858 F.2d 1521, 1524 (11th Cir. 1988) (citing 1974 U.S.C.C.A.N. 4279, 4340). In essence, the 1974 Act operates to preclude municipalities from applying *industrial* construction and safety standards to manufactured housing that differ from those federal standards developed by the U.S. Department of Housing and Urban Development ("HUD"). *See id.* The provisions of the 1974 Act are replete with language directed at improving construction and safety standards within the manufactured housing industry: *e.g.*, manufacturers of the homes must notify purchasers about any construction or safety defects, and often must correct those defects free of charge (42 U.S.C. § 5414(a), (g)); when a manufacturer discovers a defect before the home is purchased, the manufacturer must

---

[37] During argument on the motion to dismiss, plaintiff's counsel focused upon § 5401(b)(2), and asserted that this provision specifically broadens the preemptive scope of the Act to include any local ordinance or state law affecting plaintiff's right to sell manufactured homes to residents of Russellville, Alabama. Plaintiff has not provided, and the court has been unable to locate, support for this theory.

repurchase the home from the dealer or repair the home (*id.* § 5412(a)); HUD is authorized to release information about construction and safety defects present in a particular home (*id.* § 5413(c)(5)); and, manufacturers are required to provide purchasers with manuals that explain how to operate, maintain, and repair their manufactured housing (*id.* § 5416).

Moreover, the 1974 Act "requires the Secretary of the Department of Housing and Urban Development to establish Federal manufactured home construction and safety standards and to issue regulations to carry out the purposes of the Act." 24 C.F.R. § 3282.1. Consistent with that instruction, HUD has promulgated standards that cover "all equipment and installations in the design, construction, fire safety, plumbing, heat-producing and electrical systems" of manufactured housing. 24 C.F.R. § 3280.1.

Despite plaintiff's assertion to the contrary, the language, legislative history, and subsequent court explication of the 1974 Act persuades this court that the legislation is directed solely at the construction and safety standards employed by *manufacturers* of housing units fabricated or assembled in industrial plants. In the absence of explicit statements of congressional intent to do so, the reach of the 1974 Act — even after the December 2000 amendments — cannot be stretched so far as to encompass all "exclusionary zoning practices" of municipal governments.[38] *See* William G. Phelps, *Pre-Emptive Effect of Construction and Safety Standards of National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C. §§ 5401-5426)*, 172 A.L.R. Fed. 349 (2001) (noting and citing cases, including those handed down after the 2000 amendments, for the proposition that the 1974 Act does not preempt local zoning and land use laws).

Indeed, "[t]he law is well-settled that legislated zoning ordinances are permissible,

---

[38] Plaintiff's Response (doc. no. 28), at 13.

constitutional uses of police power and are not reviewable by district courts unless they are clearly

arbitrary and unreasonable, having no substantial elation to the public health, safety, morals, or

general welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71

L.Ed 303 (1926); *see also Scurlock*, 858 F.2d at 1525; *Grant v. County of Seminole, Florida*, 817

F.2d 731, 736 (11th Cir. 1987).  Further, "governmental bodies ... 'have the right to set minimum

standards for housing in residentially-zoned districts." *Scurlock*, 858 F.2d at 1525.

Plaintiff correctly observes that § 5403(d) explicitly defines the preemptive scope of this

federal law.  *See Scurlock*, 858 F.2d at 1523; *see also Turner*, 674 So. 2d at 62.  The Eleventh

Circuit interpreted the language of § 5403(d) as

> clearly preclud[ing] states and municipalities from imposing *construction and safety*
> standards upon mobile homes that differ in any respect from those developed by
> HUD. Thus, if the [municipal] ordinance conditioned mobile home entry into or sale
> in the town on compliance with the [state or local building codes], thereby forcing
> *manufacturers* to meet construction and safety requirements other than HUD
> standards in order to do business in the City, the municipal act would be preempted.

*Scurlock*, 858 F.2d at 1524 (footnote and citation omitted) (emphasis added); *see also Georgia*

*Manufacturers Housing Association, Inc. v. Spalding County, Georgia*, 148 F.3d 1304, 1309 (11th

Cir. 1998) (same).  The Code of Federal Regulations also addresses the preemptive reach of the

statute, and states that:

> No State or locality may establish or enforce any rule or regulation or take any action
> that stands as an obstacle to the accomplishment and execution of the full purposes
> and objectives of Congress.  The test of whether a State rule or action is valid or
> must give way is whether the State rule can be enforced or the action taken without
> impairing the *Federal superintendence of the manufactured home industry* as
> established by the Act.

24 C.F.R. § 3282.11(d) (emphasis supplied); *see also Scurlock*, 858 F.2d at 1525.  The question

before this court, then, is whether Russellville's zoning ordinances impair "Federal superintendence

18

of the manufactured home industry," thus warranting preemption of the ordinances.

The City of Russellville has enacted zoning ordinances governing the make-up of its residential districts. The ordinance relevant to the present controversy — § 41.0 of the City's zoning code — provides:

> SECTION 41.0. R-1 RESIDENTIAL DISTRICT.  This district exists for the development of large lot, low density residential areas.  The use of land and buildings with such areas is therefore limited to a single-family detached dwelling and such non-residential uses as generally support and harmonize with such low density districts.
>
> ...
>
> *Uses Prohibited*:    *Mobile homes, mobile home parks*; commercial or industrial uses, including parking lots or parking areas in connection with these uses.[39]

Section 31.22 of the City's zoning ordinances defines "mobile home" in the following manner:

> MOBILE HOME.  The term "mobile home" shall be construed to mean and include any structure intended for, or capable of, human habitation, mounted upon wheels and capable of being driven, propelled, or towed from place to place without change in structure or design, *by whatsoever name or title it is colloquially or commercially known.  Removal of wheels and placing such a structure on the ground, piers, or other foundation, shall not remove such a vehicle from this definition*, provided that this definition shall not included [sic] transport trucks or vans equipped with sleeping for a driver or drivers.[40]

Nowhere within these zoning ordinances has the City of Russellville prescribed construction or safety standards applicable to the manufactured home industry.  Rather, the ordinances clearly are aesthetic in character, and attempt to structure low-density residential areas with non-transitory, single-family homes.  If, instead, the City had attempted to "regulate and even exclude manufactured homes through zoning enforcement that is based *solely on a construction and safety code different*

---

[39] First Amended Complaint (doc. no. 35), at 6 (emphasis supplied).

[40] *Id.* (emphasis supplied).  This definition also includes manufactured homes of the type at issue in this action.

19

*than that prescribed by the [1974] Act*," the City would be "without authority to do so." *Manufactured Housing: Statement of Policy 1997-1, State and Local Zoning Determinations Involving HUD-Code*, 62 Fed. Reg. 24,337 (May 5, 1997) (emphasis supplied).

Russellville's ordinances can be differentiated from those addressed in *Scurlock*, where the Eleventh Circuit determined that the City of Lynn Haven, Florida was "attempting to exclude the Scurlock's mobile home from its R-AA section based solely on its safety code." 858 F.2d at 1525. The ordinances there had restricted the placement of the plaintiffs' mobile home because the home did not meet local building and construction codes. The *Scurlock* Court distinguished impermissible zoning ordinances from those that would be permissible, saying that, if the City had legislated for aesthetic, health, safety, moral, or general welfare purposes, "[u]ndoubtedly the City could limit Zone R-AA to conventionally-built residences and exclude mobile homes." *Id.* However, because the City ordinances at issue in *Scurlock* had

> greater safety requirements for a mobile home than the Federal Act, the ordinance must give way to the Act. There is no other impediment to the Scurlock's being granted a building permit and we affirm the district court. The City cannot attempt land use and planning through the guise of a safety provision in an ordinance when that safety requirement is preempted by federal law....

*Id.* (citations omitted).

This court finds instead that Russellville's ordinances resemble those considered by the Eleventh Circuit in *Georgia Manufactured Housing Association, Inc. v. Spalding County*, 148 F.3d 1304 (11th Cir. 1998).

> By defining the scope of the federal superintendence of the mobile home industry, *Scurlock* establishes that the construction and safety standards preempted by the Act are those standards that protect consumers from various potential hazards associated with manufactured housing. *In contrast, a zoning requirement related to aesthetics is not preempted because the goals and effects of such a standard have nothing to do with consumer protection, but instead seek to control the aesthetic quality of a*

> *municipality's neighborhoods.*

*Id.* at 1310 (emphasis supplied); *see also Grant v. County of Seminole, Florida*, 817 F.2d 731, 735 (11th Cir. 1987) (holding that city zoning ordinances that precluded mobile or manufactured homes from being sited in residential districts zoned R-1A were permissible, because they were "rationally related to [the City's] public health, safety and welfare goals ....," and amounted to a restriction on the placement of the mobile homes, rather than a restriction on the industrial standards applicable to the construction of the home itself). As another court within this Circuit has written: "Neither the [1974] Act nor the regulations extinguish the time-honored ability of local communities to regulate the placement of a home without regard to the federally-required construction and safety standards for the home itself." *Burton v. City of Alexander City, Alabama*, 2001 WL 527415, No. CIV. A. 99-D-1233-E, at *7 (M.D. Ala. March 20, 2001). The *Burton* holding is particularly persuasive because the plaintiffs there, like plaintiff here, argued that the "1974 Act prevents a community from using zoning ordinances to limit the siting of manufactured homes within its jurisdiction." *Id.*

This court concludes, therefore, that the 1974 Act is concerned solely with preempting local zoning ordinances that attempt to supercede the construction and safety standards imposed by Congress upon manufacturers of housing units fabricated or assembled in industrial plants. As long as a municipality's ordinances do "not alter or excuse the requirements for HUD certification, but simply impose[] an aesthetic condition for placement of manufactured homes in certain localities within the [City]," such zoning ordinances will not conflict with the proper operation of, and thus will not be preempted by, the 1974 Act. *Georgia Manufactured Housing Association, Inc.*, 148 F.3d at 1311. Accordingly, the court finds that plaintiff's preemption argument is without merit, and

proceeds to consider plaintiff's Constitutional claims.

**B.      Due Process Claims**

"The Due Process Clause is the source of three types of Section 1983 claims: (1) violations

of incorporated provisions of the Bill of Rights; (2) violations of its substantive component; and (3)

violations of its procedural component." *Burch v. Apalachee Community Mental Health Services,*

*Inc.*, 840 F.2d 797, 800 (11th Cir. 1988) (en banc), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113,

110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

The Eleventh Circuit illustrated the cleavage between the substantive and procedural

components of the Due Process Clause in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (en

banc),[41] saying:

> The Due Process Clause of the Fourteenth Amendment provides "nor shall
> any State deprive any person of life, liberty, or property, without due process of
> law." U.S. Const. amend. XIV, § 1.  The Supreme Court's interpretation of this
> clause explicates that the amendment provides two different kinds of constitutional
> protection: procedural due process and substantive due process.  *Cf. Zinermon v.*
> *Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). A violation
> of either of these kinds of protection may form the basis for a suit under section
> 1983.  *Id.*
>
> The substantive component of the Due Process Clause protects those rights
> that are "fundamental," that is, rights that are "implicit in the concept of ordered
> liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288

---

[41] In *McKinney v. Pate*, the Eleventh Circuit, sitting *en banc*, addressed the claims of a former county employee who alleged that the stated reasons for terminating his employment were untrue (pretextual) and, thus, that his firing by the county commission for what amounted to "no reason" violated "his 'constitutional employment rights' and ... denied him substantive due process of law." 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc). The *McKinney* Court framed the issue presented as

> whether, under the Fourteenth Amendment, a government employee possessing *a state-created*
> *property interest* in his employment states a *substantive* due process claim, rather than a *procedural*
> due process claim, when he alleges that he was deprived of that employment interest by an arbitrary
> and capricious *non-legislative* government action.

20 F.3d at 1553 (emphasis supplied). In the process of answering that question in the negative, the *McKinney* Court explained the concept of "substantive due process," and contrasted it to the concept of "procedural due process."

(1937).  The Supreme Court has deemed that most — but not all — of the rights enumerated in the Bill of Rights are fundamental; certain unenumerated rights (for instance, the penumbral right of privacy, *see Planned Parenthood v. Casey*, 505 U.S. 833, ___, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992))[,] also merit protection. It is in this framework that fundamental rights are incorporated against the states. A finding that a right merits substantive due process protection means that the right is protected "against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, ___, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).

Although the Supreme Court has extended substantive due process protection to certain unenumerated rights, it has not extended Fourteenth Amendment coverage to a host of other areas.  In fact, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.  The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.  *Collins*, 503 U.S. at ___, 112 S.Ct. at 1068 (citation omitted).  Hence, remaining largely outside the scope of substantive due process jurisprudence are tort law, *see Daniels*, 474 U.S. at 332, 106 S.Ct. at 665, and public employment law, *see, e.g., Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976), *and Board of Regents v. Roth*, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 2709-10, 33 L.Ed.2d 548 (1972).

In short, areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985) (Powell, J., concurring). As a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural — not substantive — due process are observed.

Substantive due process rights differ from their procedural counterparts in a second, important fashion: the manner in which a violation of the right occurs.  A violation of a substantive due process right, for instance, is complete when it occurs; hence, the availability *vel non* of an adequate post-deprivation state remedy is irrelevant.  Because the right is "fundamental," no amount of process can justify its infringement.  By contrast, a procedural due process violation is not complete "unless and until the State fails to provide due process." *Zinermon*, 494 U.S. at 123, 110 S.Ct. at 983.  In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.

23

*McKinney*, 20 F.3d at 1555-58 (footnotes omitted).

###### 1. Substantive due process

Before addressing any claims of plaintiff that may be based upon the substantive component of the Due Process Clause, it is important to note the distinction between "legislative" and "non-legislative" (or "executive") acts, and the difference that divergence works on a court's analysis of substantive and procedural due process claims. Then-Chief Judge Tjoflat, speaking for an *en banc* Eleventh Circuit in *McKinney v. Pate*, described the separation in the following manner:

> *Executive acts* characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch. The most common examples are employment terminations, *e.g.*, *Roth*, 408 U.S. at 566, 92 S.Ct. at 2703. (The substantive/procedural distinctions we discuss in this opinion are appropriate to cases — like this one — involving non-legislative acts).

> *Legislative acts*, on the other hand, generally apply to a larger segment of — if not all of — society; laws and broad-ranging executive regulations are the most common examples. The analysis, and the substantive/procedural distinction discussed above, that is appropriate for executive acts is *inappropriate* for legislative acts. For instance, only when addressing legislative acts has the Supreme Court mandated that states must demonstrate that they are violating private interests only as necessary to promote state interests. *See, e.g., Foucha v. Louisiana*, 504 U.S. 71, —, 112 S.Ct. 1780, 1804, 118 L.Ed.2d 437 (1992) (Thomas, J., dissenting); *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). A similar balancing test is not found in executive-act cases. Legislative-act cases therefore are distinguishable from the case at hand.

*McKinney*, 20 F.3d at 1557 n.9 (emphasis added).

###### a. legislative acts

Plaintiff has not alleged the violation of any "fundamental" right, unless he is attempting to claim that Russellville's "antiquated" zoning ordinances deprived him of the desired, or preferred

use of his land and, thus, constituted a "taking" proscribed by the Fifth Amendment.[42] This is not a "Takings Clause" case, however, because plaintiff has not alleged (nor could he contend) that he has been deprived of *all* economically viable use of his property. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 122 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992).

Substantive due process claims not involving a fundamental right, but based upon a "legislative act" (*e.g.*, zoning ordinances), are evaluated under a "rational basis" test. *See, e.g., TRM, Inc. v. United States*, 52 F.3d 941 (11th Cir. 1995). The *TRM, Inc.* Court considered the following question: whether federal regulations governing the acceptance of food stamp coupons by authorized retail stores[43] violated the substantive due process rights of a grocery store owner who was disqualified from participation in the food stamp program because "two of [his] store's employees allegedly accepted food stamps in exchange for cash." *Id.* at 942-43. The court addressed that issue in terms of a "legislative act," and explained:

> Substantive due process claims not involving a fundamental right are reviewed under the rational basis test. *See, e.g., Parks v. City of Warner Robins,* 43 F.3d 609, 614-15 (11th Cir. 1995) (reviewing under rational basis test anti-nepotism policy that did not directly and substantially interfere with the fundamental right to marry); *see also In re Wood,* 866 F.2d 1367, 1371 (11th Cir. 1989) ("The standard for evaluating substantive due process challenges to social and economic legislation is virtually identical to the 'rational relationship' test for evaluating equal protection claims.... [A]ny plausible reason supporting Congress' action in enacting the suspect legislation satisfies the 'rational basis' test."); *Silver v. Baggiano,* 804 F.2d 1211, 1218 (11th Cir. 1986) ("[I]n order to satisfy substantive due process requirements, the legislation must be rationally related to its purpose and must not be arbitrary or discriminatory.").

---

[42] The Fifth Amendment provides, among other things, that: "No person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment's "Takings Clause" has long been held applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 527 L.Ed.2d 631 (1978); *Chicago, Burlington & Quincy Railroad Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

[43] *See* 7 C.F.R. § 278.2.

*TRM, Inc.*, 52 F.3d at 945. The *TRM, Inc.* Court underscored that "[t]his standard is not affected by our decision in *McKinney v. Pate* .... The holding of that case was specifically limited to substantive due process challenges to non-legislative [*executive*] acts." *Id.* at 945 n. 17 (citations omitted).

Of course, "rational basis" scrutiny of legislative acts neither implicating fundamental rights, nor based upon suspect classifications, is not a rigorous standard.

> This test is generally easily met. A searching inquiry into the validity of legislative judgments concerning economic regulation is not required .... The task is to determine if 'any set of facts may be reasonably conceived to justify' the legislation.... To put it another way, the legislation must be sustained if there is any conceivable basis for the legislature to believe that the means they have selected will tend to accomplish the desired end. Even if the court is convinced that the political branch has made an improvident, ill-advised or unnecessary decision, it must uphold the act if it bears a rational relation to a legitimate governmental purpose.

*Id.* at 945-46 (quoting *Cash Inn of Dade, Inc. v. Metropolitan Dade County,* 938 F.2d 1239, 1241 (11th Cir. 1991) (reviewing local ordinance requiring pawn shops to close at 5:00 p.m.) (citations omitted)); *see also, e.g., United States v. Osburn,* 955 F.2d 1500, 1505 (11th Cir. 1992) (observing that court will consider "any rationale Congress 'could' have had for enacting the statute ... regardless of whether Congress actually considered that rationale at the time the bill was passed").

In order to determine whether any set of facts may be reasonably conceived to justify the Russellville zoning ordinances challenged by plaintiff, this court found it helpful to review the former Fifth Circuit's opinion in *Maher v. City of New Orleans*, 516 F.2d 1051 (5th Cir. 1975).[44] *Maher* addressed a substantive due process challenge to a New Orleans ordinance that regulated the preservation and maintenance of buildings in the Vieux Carre section of that city, popularly known as the French Quarter.

---

[44] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

A legislative determination is generally accorded a presumption of constitutionality, but it is nevertheless subjected to several tests before its validity is established. To be sound, the enactment must be within the perimeter of the police power, an authority residing in the law-making body to secure, preserve and promote the general health, welfare and safety. A regulatory ordinance, to be sustained as a suitable exercise of the police power, must bear a real and substantial relation to a legitimate state purpose. The means selected must be reasonable and of general application, and the law must not trench impermissibly on other constitutionally protected interests.

> ...

It is generally accepted that legislative bodies are entrusted with the task of defining the public interest and purpose, and of enacting laws in furtherance of the general good.

> ...

"The values [that the police power] represents are spiritual as well as physical, aesthetic as well as monetary. It is within the domain of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." *[Berman v. Parker*, 348 U.S. 26, 33, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954).]

This circuit has held in *Stone v. City of Maitland* that zoning ordinances may be sustained under the police power where motivated by a desire to "enhanc[e] the aesthetic appeal of a community." [446 F.2d 83, 89 (5th Cir. 1971)] The Court noted with approbation city action to maintain "the value of scenic surroundings" and "the preservation of the quality of our environment." [*Id.*]

*Maher*, 516 F.2d at 1059-60 (footnotes omitted). Ultimately, the *Maher* court concluded that, "[s]ince we deal here with legislation designed to effect a legitimate economic and social policy, *so long as the means chosen — a matter largely entrusted to the legislature — are reasonable and not arbitrary, due process is satisfied.*" *Id.* at 1061 (footnote omitted) (emphasis supplied).

The challenged Russellville ordinances survive rational basis review. Enhancing the overall "aesthetic appeal of a community" is a legitimate governmental purpose, *id.* at 1060, and the means chosen by the City — the exclusion of mobile homes, mobile home parks, house trailers, trailer

courts, and the like from R-1 residential zones — are both reasonable and rationally related to the purpose of enhancing the aesthetic quality of the community.

      **b.    executive acts**

Alternatively, and probably more likely, plaintiff appears to claim that Russellville's Building Inspector, defendant Bois Porter, arbitrarily and capriciously denied him a certificate of occupancy for the manufactured home at 233 Doris Street, thereby constituting a non-legislative, or "executive" deprivation of plaintiff's substantive due process rights. Plaintiff's claim in this regard is due to fail in light of the Eleventh Circuit's decision in *DeKalb Stone, Inc. v. County of DeKalb*, 106 F.3d 956 (11th Cir. 1997). In that case, the appellant stone cutting company argued that a Georgia county had "arbitrarily and capriciously" used single-family residential zoning ordinances as the basis for ordering the company to cease blasting and quarry operations, "thereby depriving [appellant] of the *legal nonconforming use* of its property." *Id.* at 959 (emphasis supplied).[45] The Eleventh Circuit held that the claim was without merit, and explained that:

> Appellant states that it has been deprived of the right to use its land as a nonconforming use under existing zoning laws. *It is well established that land use rights, as property rights generally, are state-created rights. Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989). The district court properly held that any property right possessed by Appellant was a state-created land use right.
>
> Also fundamental to an understanding of this issue is the fact that enforcement of existing zoning regulations is an executive, not legislative, act. We have previously held that a "legislative act involves policy-making rather than mere administrative application of existing policies. Acts of zoning enforcement rather

---

[45] The phrase "legal nonconforming use" was emphasized in the textual quote because the appellant in *DeKalb Stone*, like the plaintiff here, initially had been denied a licence to use its property in a desired manner, due to the property's location within an area zoned for "single family residential use." However, the appellant in *DeKalb Stone*, *unlike* the plaintiff here, appealed that ruling to the county's Board of Zoning Appeals, which "overturned [the] administrative decision that [appellant's] quarry ... is not a legal non-conforming use (183 acre quarry approved as a legal non-conforming use)." *DeKalb Stone*, 106 F.3d at 957-58.

than rulemaking are not legislative." *Crymes v. DeKalb County*, 923 F.2d 1482, 1485 (11th Cir. 1991) (citations omitted).

> *The question therefore becomes whether a substantive due process cause of action exists where an executive actor deprived Appellant of a state-created property right.* Appellant cites no authority to support the existence of such a claim, and we find considerable authority to the contrary. *This Court held en banc that a plaintiff did not present a substantive due process claim when he alleged an executive deprivation of a state-created right. McKinney*, 20 F.3d 1550 (11th Cir. 1994) (en banc), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995) ....

> ...

> Moreover, we have briefly addressed the *unavailability of this cause of action in the context of state-created property rights. Where a property owner alleged that town executives arbitrarily and capriciously refused to issue a certificate of occupancy — another variety of state-created land use right — we held that no substantive due process claim had been stated. Boatman v. Town of Oakland*, 76 F.3d 341, 346 (11th Cir.1996); *see also Kauth v. Hartford Ins. Co. of Ill.*, 852 F.2d 951, 956-58 (7th Cir.1988). As in *McKinney, Breeding*, and *Boatman*, Appellant has alleged an executive violation of a state-created property right, not a deprivation of any constitutional right.

*DeKalb Stone, Inc.*, 106 F.3d at 959-60 (emphasis added); *see also, e.g., Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979) ("Decisions of the Executive Branch, however serious their impact, do not automatically invoke due process protection; there simply is not a constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations.") (citations omitted).

Plaintiff claims here that he is entitled to a certificate of occupancy, despite his property's location in a residential zone prohibiting manufactured homes. Plaintiff thus seeks to enforce a right created by state law, an action unavailable to him in light of *DeKalb Stone, Inc.*

### 2.    Procedural due process

#### a.    legislative acts

29

The court once again must infer the basis for plaintiff's procedural due process claim, and assume that plaintiff's claim is based, in part, on the contention that Russellville's zoning ordinances are "antiquated," because they have been subject to legislative *inaction* for more than twenty years. *See Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070 (5th Cir. 1989). Dated though they may be, the City's zoning ordinances are nevertheless properly characterized as "legislative acts"; and, "it is well established law that once an action is characterized as legislative, procedural due process requirements do not apply." *Id.* at 1074 (citing *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915); *United States v. LULAC*, 793 F.2d 636, 648 (5th Cir. 1986)); *see also Richmond Boro Gun Club, Inc., v. City of New York*, 97 F.3d 681, 689 (2nd Cir. 1996) ("[A]ppellants cannot successfully challenge a legislative act on procedural due process grounds. 'When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process — the legislative process. The challenges to such laws must be based on their substantive compatibility with constitutional guarantees.") (quoting 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 17.8 (2d ed. 1992)). Consequently, plaintiff's procedural due process challenge in this regard must fail.

### b.   executive acts

Plaintiff's procedural due process claim may instead attack the Russellville Building Inspector's denial of the certificate of occupancy as an executive act. If that is plaintiff's charge, then defendants contend that he failed to avail himself of adequate procedural remedies provided

by local ordinances and state statutes.[46]  Plaintiff disputes this contention.[47]

The Eleventh Circuit considered a case on similar facts, in which the plaintiffs failed to avail themselves of the codified zoning appeals process in order to dispute the defendant's refusal to issue a certificate of occupancy for plaintiffs' manufactured home. *See Boatman v. Town of Oakland*, 76 F.3d 341 (11th Cir. 1996).  When the Oakland building inspector refused to "perform a final inspection so that the Town could issue them a certificate of occupancy" because, "[i]n his opinion, the Boatmans had constructed a 'mobile home' in violation of a provision of the Town's zoning ordinance that prohibited the placement of mobile homes on lots in the Boatmans' residential district,"

> the Boatmans invoked the court's federal question jurisdiction, bringing a claim under 42 U.S.C. § 1983. They alleged in their complaint that the Town's refusal to issue a certificate of occupancy was "arbitrary and capricious" and thus deprived them of a "vested property right in their building permit" in violation of the Fourteenth Amendment.

*Id.* at 343.  The *Boatman* Court concluded that the plaintiffs' claim failed because "the state provided the Boatmans all the process they were due." *Id.* at 346.  In doing so, the Eleventh Circuit relied on the fact that the plaintiffs

> could have sought a ruling from the Town's Zoning Board of Adjustment that their structure was not a mobile home. Or, if the Zoning Board disagreed, they could have requested a variance, which the Board had the power to grant. The Boatmans knew of these options because Mrs. Boatman was a member of the Zoning Board. The Boatmans eschewed these options, however, and went to the Town Council instead. They asked the Council to arrange for their home to be inspected and, if it passed

---

[46] As discussed *infra* in this section, Russellville Zoning Ordinance § 92.0 provides an aggrieved party the right to appeal to the Zoning Board of Adjustment any adverse decision of an administrative officer. Further, Ala. Code § 11-52-81 (1975) allows: "Any party aggrieved by any final judgment or decision of such board of zoning adjustment may within 15 days thereafter appeal therefrom to the circuit court...."

[47] Plaintiff also argues that such remedies are inapplicable because all local zoning ordinance and state laws pertaining to the siting of manufactured homes are preempted by the National Manufactured Housing Construction and Safety Standards Act of 1974, as amended, 42 U.S.C. §§ 5401-5426 ("1974 Act").  As explained above, however, plaintiff's reliance on the 1974 Act in light of the facts in this case is misplaced. *See supra* Part IV.A.

> inspection, to issue a certificate of occupancy. The Council referred the matter to its attorney for an opinion. He concluded that the Boatmans' structure was a mobile home as defined in the zoning ordinance. The Council accepted its attorney's opinion, and informed the Boatmans that a final inspection would not be made.
>
> The Boatmans sought legal advice from a private attorney. The record, of course, does not indicate what advice the Boatmans received. We do know, however, that the Boatmans did not seek relief in the Orange County circuit court. The Boatmans concede that the circuit court could have ordered the building inspector to perform a final inspection; that court, like the district court, could have concluded that their structure did not fall within the zoning ordinance's definition of a mobile home. And if, after a satisfactory inspection, the Town Council nonetheless refused to issue a certificate of occupancy, the same court could have ordered the Council to do so.

*Id.* at 345.

In like manner, Alabama state law provides the present plaintiff all the process he is due. Section 92.0 of Russellville's zoning ordinances provides that "an appeal may be taken to the Board [of Zoning Adjustment] by any person aggrieved, or by an officer, department, board or bureau of the municipality affected by any decision of the administrative officer." If the aggrieved party does not receive a satisfactory result at that level, the Alabama Code provides for further review.

> Any party aggrieved by any final judgment or decision of such board of zoning adjustment may within 15 days thereafter appeal therefrom to the circuit court by filing with such board a written notice of appeal specifying the judgment or decision from which the appeal is taken. In case of such appeal such board shall cause a transcript of the proceedings in the action to be certified to the court to which the appeal is taken, and the action in such court shall be tried de novo.

Ala. Code § 11-52-81 (1975) (1994 Replacement Vol.). Therefore, plaintiff had more than adequate administrative and state judicial remedies available to him. Plaintiff's choice to not pursue such procedural remedies does not create a constitutional violation immediately actionable in federal court under § 1983. As the Eleventh Circuit observed in *McKinney v. Pate*, "only when the state

refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." 20 F.3d at 1557.

## C.   Equal Protection Claims

Plaintiff's Equal Protection Clause challenge to Russellville's zoning ordinances may be "facial" or "as applied." *See GJR Investments, Inc.*, 132 F.3d at 1367. Plaintiff appears to bring an "as applied" challenge, arguing that "the intentional or purposeful nature of Defendants['] violation of Plaintiff's right to equal protection is evidenced by Defendants allowing some individuals to site manufactured homes within the city limits, while denying that right to others — such as Plaintiff."[48]

> It is well settled that unequal application of a facially neutral statute may violate the Equal Protection Clause. In order to prevail on an equal protection claim based upon the application of a facially neutral statute, it must be establish[ed] that: (1) the *plaintiff was treated differently than similarly situated persons*; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff.

*Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) (citations omitted) (emphasis supplied). In other words, "'[d]ifferent treatment of dissimilarly situated persons does not violate the Equal Protection Clause.'" *Id*. at 265 (citing *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)).

It is immediately problematic, then, that plaintiff does not allege the existence of *any* other property owner who sited a manufactured home on property located in an R-1 residential zone, then applied for, and was granted, a certificate of occupancy. Although plaintiff alleges that he was "told *by the developer* from whom he purchased the lots" that the property "had approval from the

---

[48] Plaintiff's Response (doc. no. 28), at 19.

Russellville Zoning Board ... and the City Building Inspector ... for siting manufactured housing,"[49] and despite his assertion that the subject lots had "been unanimously approved by the Russellville Planning Commission for a community of manufactured housing,"[50] plaintiff does not allege that the previous owner applied for, and was granted, a certificate of occupancy for a manufactured home placed on that same property, or any other property located in an R-1 residential zone, absent a variance from "the Zoning Board of Adjustment."[51]  Plaintiff *does* allege, however, that

> the City has repeatedly allowed other manufactured homes within its city limits, including modular homes.  Indeed, the Mayor of Russellville has a manufactured home located on his property.  Bois Porter, building inspector, admits to having a manufactured home on his property in the City of Russellvilee until 1988, and upon information and belief, he still owns it.  In fact, minutes from meetings of the Russellville Planning Commission and Zoning Board of Adjustment are replete with decisions to allow individuals to site manufactured homes on property inside the city limits and in areas designated as "R-1," "R-2," and "R-3."[52]

The insufficiency of these allegations lies in what they do *not* say:  *e.g.*, plaintiff does not allege that the Mayor's, or the Building Inspector's, mobile homes were sited on property within an "R-1" zone, or that if they were placed in such a residential zone, that the Mayor or Building Inspector obtained a certificate of occupancy without first appealing to, and obtaining a decision allowing the non-conforming use from, the Zoning Board of Adjustment.  The assertion that "minutes from meetings of the Russellville Planning Commission and *Zoning Board of Adjustment* are replete with decisions to allow individuals to site manufactured homes on property inside the city limits and in areas designated as 'R-1,' 'R-2,' and 'R-3'" merely underscores the point made by the Building Inspector when he denied plaintiff a certificate of occupancy: "This office cannot connect or inspect

---

[49] First Amended Complaint (doc. no. 35), ¶ 7.

[50] *Id.* ¶ 8.

[51] *Id.* ¶ 20.

[52] *Id.* ¶ 21.

and approve utility connection[s] *until there is a favorable ruling from the Zoning Board of Adjustment.*"[53]  Thus, plaintiff fails to allege he suffered treatment different from similarly situated individuals, and that is fatal to his equal protection claim.

**D.     Qualified Immunity**

**1.     Sufficiency of pleading**

Plaintiff named four governmental entities and twenty-five individuals as defendants in the *captions* of both his original and amended complaints.[54]  However, the *text* of plaintiff's amended complaint specifically identifies, and alleges culpable conduct by, only two of the twenty-five individual defendants named in the caption: the City's Building Inspector, Bois Porter,[55] and Mayor (who is the subject of plaintiff's claim in a single instance, and then is identified only by title).[56]  Other than a global assertion that "the individual Defendants are all officials of the City of Russellville, and Russellville Electrical Board,"[57] plaintiff neglected to inform defendants or this court what each of the remaining twenty-three persons *did* that is alleged to have caused injury to plaintiff.

The term "caption" refers to the introductory part of a court pleading, "stating the names of the parties, the name of the court, the docket or file number, and the title of the action." *Black's Law Dictionary* 203 (7th ed. 1999).  Federal Rule of Civil Procedure 10 requires that:

> Every pleading shall contain *a caption* setting forth the name of the court, the title of the action, the file number, and a designation as in Rule 7(a).  *In the*

---

[53] *Id.* ¶ 20 (emphasis supplied).

[54] *See supra* note 1.

[55] First Amended Complaint (doc. no. 35), ¶¶ 3, 20, 21, 27, 28.

[56] *Id.* ¶ 21.

[57] *Id.* ¶ 2.

> *complaint the title of the action shall include the names of all the parties*, but in other pleadings it is sufficient to state the name of the first party on each side with an appropriate indication of other parties [*e.g.*, "*et al.*"].

Fed. R. Civ. P. 10(a) (emphasis supplied). However, the caption of a complaint is *not* considered part of a plaintiff's statement of his claims in accordance with Rule 8. Rather, as the Eleventh Circuit observed in *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (en banc),

> [t]he caption is something apart, being mandated by a different rule: Fed.R.Civ.P. 10. The caption is chiefly for the court's administrative convenience. It may, however, sometimes be useful to look at the caption — when the Rule 8 statement of a claim is ambiguous about a party's capacity — to settle pleading ambiguities. *See Hobbs v. E.E. Roberts*, 999 F.2d 1526, 1529-30 (11th Cir. 1993) (using several factors, including caption, to resolve ambiguity of whether official sued in official or individual capacity).

*Id.* at 1023 n.4. It is upon this fundamental point of pleading that plaintiff's claims against the individual defendants first stumble.

Even the lenient, "short and plain statement" standard of Rule 8(a) requires that the textual allegations of a complaint contain sufficient detail to prevent a defendant and the court from having to ask — in the words of a popular hamburger commercial from the 1980s — "*Where's the beef?*" The Eleventh Circuit put the point more elegantly in *Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984), saying:

> Even under the so-called notice rules of pleading, the complaint must state a cause of action sufficient to affirmatively show the plaintiff is entitled to relief, for

>> [i]t is not enough, to indicate merely that the plaintiff has a grievance but sufficient detail must be given so that the defendant, and the Court, can obtain a fair idea of what the plaintiff is complaining, and can see that there is some legal basis for recovery.

*Id.* at 556 (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.13, at 8-118 (2d ed. 1984)).  Despite plaintiff's lack of clarity, the court turns to the qualified immunity defense asserted by each individual defendant.

### 2.   Qualified immunity

When a state or local governmental official is sued personally, or in an "individual capacity," for money damages under § 1983, the official may invoke the doctrine of "qualified immunity" as a defense to the claim.  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).  Essentially, the doctrine "protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter v. Alabama A & M University*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (citations and internal quotation marks omitted).  Qualified immunity is the "usual rule," meaning that "only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Id*.  The doctrine "gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (internal quotations omitted); *see also Busby v. City of Orlando*, 931 F.2d 764, 773 (11th Cir. 1991).

For such reasons the Supreme Court and Eleventh Circuit have instructed district courts "to apply the affirmative defense of qualified immunity at the earliest possible stage in litigation because the defense is immunity from suit and not from damages only." *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir. 2001) (en banc) (citations omitted).

"A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)); *see also McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999) (same). A motion to dismiss will be granted if the "complaint fails to allege the violation of a clearly established constitutional [or federal statutory] right." *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001) (citing *Williams v. Alabama State University*, 102 F.3d 1179, 1182 (11th Cir. 1997)).

As the discussion preceding this section concluded, plaintiff has failed to allege facts establishing that defendants' actions deprived him of any federal statutory or constitutional rights. Even had plaintiff been able to do so, however, he still would fail to meet his "burden of showing that the federal 'rights' allegedly violated were 'clearly established.'" *Lassiter*, 28 F.3d at 1150 n.3 (quoting *Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir. 1989)); *see also Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)); *Busby*, 931 F.2d at 773 ("The plaintiff has the burden of showing that the defendant violated clearly established constitutional rights."). Indeed, plaintiff has not provided this court with *any* authority that the denial of a certificate of occupancy for his manufactured home under these circumstances constituted a violation of a federal statute, or a deprivation of federal constitutional rights.

E.   **Civil Conspiracy Claim**

Plaintiff's final claim is that "[d]efendants are liable for the conspiracy to violate Plaintiffs

[sic] statutory and constitutional rights."[58]  That statement constitutes the full extent of plaintiff's

conspiracy claim.  The former Fifth Circuit held that "mere conclusory allegations of conspiracy

cannot, absent reference to material facts, survive a motion to dismiss."  *Sparks v. Duval County*

*Ranch Company, Inc.*, 604 F.2d 976, 978 (5th Cir. 1979) (en banc).  The Eleventh Circuit reiterated

this principle in *Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984), holding that:

> In civil rights and conspiracy actions, courts have recognized that more than
> mere conclusory notice pleading is required. In civil rights actions, it has been held
> that a complaint will be dismissed as insufficient where the allegations it contains are
> vague and conclusory. *See, e.g., Burnett v. Short*, 441 F.2d 405 (5th Cir. 1971);
> *Guedry v. Ford*, 431 F.2d 660 (5th Cir. 1970); *Granville v. Hunt*, 411 F.2d 9 (5th Cir.
> 1969).  In conspiracy cases, a defendant must be informed of the nature of the
> conspiracy which is alleged. It is not enough to simply aver in the complaint that a
> conspiracy existed. *See Ostrer v. Aronwald*, 567 F.2d 551 (2d Cir. 1977); *United*
> *States Ex Rel. Simmons v. Zibilich*, 542 F.2d 259 (5th Cir. 1976). *See also Black v.*
> *United States*, 534 F.2d 524 (2d Cir. 1976); *Fine v. City of New York*, 529 F.2d 70
> (2d Cir. 1975). A complaint may justifiably be dismissed because of the conclusory,
> vague and general nature of the allegations of conspiracy. 2A J. Moore & J. Lucas,
> *Moore's Federal Practice* ¶ 8.17[5] at 8-180, 181 (2 ed. 1984). ...

*Fullman*, 739 F.2d at 556-57.

Even charitably assuming that plaintiff's conclusory assertion amounted to a cognizable civil

conspiracy claim, it still is problematic, as the moving defendants observe, that plaintiff has "failed

to identify the legal source of his conspiracy claim, whether state or federal, and more specifically,

the statutory authorization for such claim, if any."[59]  Plaintiff appears to offer two such sources of

law: § 1983 and Alabama state law.  The court first considers plaintiff's "conspiracy claim" through

the lens of 42 U.S.C. § 1983 and, subsequently, under Alabama law.

1.    **§ 1983 civil conspiracy claims**

---

[58] First Amended Complaint (doc. no. 35), ¶ 35.

[59] Defendant's Reply to Plaintiff's Response (doc. no. 32), at 9.

Plaintiff alleges that all of his claims "are based upon, and arise under, 42 U.S.C. § 1983 as a result of Defendants [sic] violations of plaintiffs' [sic] rights to due process and equal protection under law."[60] "An action for conspiracy may be maintained under section 1983." *Slavin v. Curry*, 574 F.2d 1256, 1261 (5th Cir.), *modified on other grounds*, 583 F.2d 779 (1978), *overruled on other grounds by Sparks v. Duval County Ranch Company, Inc.*, 604 F.2d 976, 978 & n.2 (5th Cir. 1979) (en banc). There are five essential elements of a cognizable § 1983 civil conspiracy claim. A plaintiff must allege (and ultimately prove) that: (1) two or more persons (2) reached an agreement to accomplish a common and unlawful plan; and that (3) at least one of the conspirators, while acting under color of state law, (4) committed an overt act in furtherance of that illegal objective which (5) deprived plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc); *Dickerson v. Alachua County Commission*, 200 F.3d 761, 767 (11th Cir. 2000); *Burrell v. Board of Trustees of Georgia Military College*, 970 F.2d 785, 793 (11th Cir. 1992); *Sparks*, 604 F.2d at 981; *Slavin*, 574 F.2d at 1261; *Nesmith v. Alford*, 318 F.2d 110, 126 (5th Cir. 1963); *Farnsworth v. Zerbst*, 98 F.2d 541, 544 (5th Cir. 1938).

Assuming for the sake of discussion that plaintiff is claiming that (1) that all of the individual defendants (2) reached an agreement to prevent plaintiff from placing a manufactured home on the lot at 233 Doris Street, and that (3) Building Inspector Bois Porter, while acting under color of state law, (4) committed an overt act in furtherance of the common and unlawful plan, plaintiff still cannot establish the final element of a conspiracy claim. As the discussion preceding this section has demonstrated, Bois Porter's denial of a certificate of occupancy did not deprive plaintiff of

---

[60] First Amended Complaint (doc. no. 35), ¶ 6.

rights, privileges, or immunities secured by the Constitution or laws of the United States. Moreover, the conspiracy claim is barred by the so-called "intracorporate conspiracy doctrine," which is examined below.

### a.    intracorporate conspiracy doctrine

The intracorporate conspiracy doctrine insulates corporate employers and employees acting as agents of the corporation from § 1983 or § 1985(3) claims alleging a civil conspiracy. *See McAndrew*, 206 F.3d at 1036 ("[A]cts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."); *Dickerson v. Alachua County Commission*, 200 F.3d 761, 767 (11th Cir. 2000) ("Under the intracorporate conspiracy doctrine, a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation."); *Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1977), *aff'g*, 421 F. Supp. 12 (E.D. La. 1976) (applying the intracorporate conspiracy doctrine to bar a § 1985(3) claim against a public university and its officials); *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952) ("A corporation cannot conspire with itself any more than a private individual can."). The Eleventh Circuit recently explained the doctrine as follows:

> Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves. The doctrine is based on the nature of a conspiracy and the legal conception of a corporation. It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks Inc.*, 140 F.3d 898, 912 (11th Cir. 1998) (explaining that a civil conspiracy ordinarily requires "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff"). However, under basic agency principles, the acts of a corporation's agents are considered to be those of a single legal actor. *Dussouy v. Gulf Coast Inv. Corp.*, 660

41

F.2d 594, 603 (5th Cir. 1981); *see also United States v. Hartley*, 678 F.2d 961, 970 (11th Cir. 1982). Therefore, just as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself. *See Dussouy*, 660 F.2d at 603 (noting that "the multiplicity of actors necessary to conspiracy" is negated when the agents' acts are attributed to the corporation and the corporation and its agents are viewed as a single legal actor); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952) (explaining that "[i]t is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.").

*McAndrew*, 206 F.3d at 1036.

The doctrine clearly applies to *public* employers and employees, not just private ones. This conclusion has long been the law of this Circuit. In *Chambliss v. Foote*, 421 F. Supp. 12 (E.D. La. 1976), the plaintiff was a non-tenured professor who brought suit against the University of New Orleans and some of its administrative officials, alleging that the university's decision to not renew her teaching contract was the product of a conspiracy to violate her civil rights. The district court concluded that "the university and its officials are considered as constituting a single legal entity which cannot conspire with itself," and dismissed the plaintiff's § 1985(3) claim. *Id.* at 15. The former Fifth Circuit "affirm[ed] on the basis of the district court's opinion." *Chambliss*, 562 F.2d 1015 (5th Cir. 1976); *see also Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994) (holding that the intracorporate conspiracy doctrine applies not just to private corporate entities, but also to governmental agencies such as the state Department of Children and Family Services); *Run After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) ("The Tribal Council as an entity or governmental body cannot conspire with itself.").

The Eleventh Circuit reaffirmed this principle in *Dickerson v. Alachua County Commission*, 200 F.3d 761, 768 (11th Cir. 2000). In *Dickerson*, an African-American plaintiff claimed that his

42

demotion from shift commander of a county jail to sergeant was the result of a conspiracy among

county officials.  The Eleventh Circuit held that the intracorporate conspiracy doctrine barred the

plaintiff's claim against the county and its employees:

> This case, like *Chambliss*, involves a § 1985(3) claims against *actors who are*
> *part of a single, public entity* and who allegedly conspired to interfere with civil
> rights.  Also like *Chambliss*, this case does not involve even a single conspirator
> from outside that public entity and does not involve any criminal conduct.  Thus,
> under *Chambliss*, the County jail and its employees are considered to constitute a
> single legal entity that cannot conspire with itself. *See Chambliss*, 421 F. Supp at 15.

*Dickerson*, 200 F.3d at 768 (emphasis added).

More recently, the Eleventh Circuit, sitting *en banc*, reaffirmed that the intracorporate

conspiracy doctrine bars § 1983 and § 1985(3) civil conspiracy claims against governmental

employers and employees of the same public entity, saying simply:  "*Chambliss* and *Dickerson*

remain the law in this Circuit." *McAndrew*, 206 F.3d at 1038.  Here, as in *Chambliss* and *Dickerson*,

plaintiff's § 1983 civil conspiracy claim is lodged against actors who are part of a single, public

entity.  As such, this federal claim is barred.

### 2.    Alabama civil conspiracy law

Plaintiff asserts an alternative source of law for his conspiracy claim in his brief, where he

argues that,

> [u]nder Alabama law, the elements of a civil conspiracy are simple: "A conspiracy
> requires a combination of two or more individuals to accomplish a lawful end by
> unlawful means." *See Pescia v. Auburn Ford-Lincoln Mercury, Inc.*, 68 F.Supp.2d
> 1269, 1280 (M.D. Ala. 1999). Here, the twenty-nine (29) named Defendants, in their
> official and individual capacities, conspired to accomplish a lawful end, upholding
> the zoning ordinances of the City of Russellville, by an unlawful means:
> discriminately applying those ordinances, in direct contravention of Federal law, and
> preventing Plaintiff from siting a manufacture home within the city limits .... All

twenty-nine (29) Defendants are implicated in each and every enumerated paragraph of Plaintiff's Complaint and such implication is evidenced by Plaintiff's inclusion of the word "Defendants" in Counts I, II, and III, contained therein.[61]

Another district court within this Circuit has provided a useful summary of Alabama's law on civil conspiracy. *See Pescia v. Auburn Ford-Lincoln Mercury, Inc.* 68 F. Supp. 2d 1269 (M.D. Ala. 1999). The *Pescia* Court observed that,

> [u]nder Alabama law, a civil conspiracy requires a combination of two or more individuals to accomplish a lawful end by unlawful means. A civil conspiracy action focuses not on the conspiracy alleged, but on the wrong committed by virtue of the alleged conspiracy. The viability of a civil conspiracy claim depends upon the viability of the claim relating to the underlying civil wrong made the subject of the conspiracy. The conspiracy itself furnishes no cause of action.

*Id.* at 1281 (citing *Williams v. Norwest Financial Alabama, Inc.*, 723 So. 2d 97, 104 (Ala. Civ. App. 1998)); *see also generally* Jenelle Mims Marsh & Charles W. Gamble, *Alabama Law of Damages* § 36-24 (4th ed. 1999).

This court need not address those principles, however, because plaintiff's complaint does not state a federal claim upon which relief can be granted; and, in the absence of federal subject matter jurisdiction, the court cannot entertain a supplemental claim founded on state law. *See* 28 U.S.C. § 1367(a). The court also lacks diversity jurisdiction under 28 U.S.C. § 1332.

## V. CONCLUSION

For all of the foregoing reasons, therefore, plaintiff's amended complaint is due to be dismissed for failure to state claims upon which relief can be granted. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

---

[61] Plaintiff's Response (doc. no. 28), 22-23.

44

DONE this _11th_ day of April, 2002.

_____
United States District Judge